United States District Court
Southern District of Texas
ENTERED
October 01, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| EDNA VILLARREAL, *Plaintiff,* | § § § | |
| v. | § | Civil No. 5:25-cv-00115 |
| FRANK BISIGNANO, Commissioner of Social Security *Defendant.* | § § § § | |

**MEMORANDUM AND ORDER**

Plaintiff Edna Villareal appeals from the decision of the Commissioner of the Social Security Administration, denying her claims for Social Security Disability Insurance and Supplemental Security Income benefits. Dkt. No. 3. This Court has jurisdiction to review the Commissioner's final decision under Section 205(g) of the Social Security Act. 42 U.S.C. § 405(g). Both parties consented to the adjudication of this administrative appeal by the undersigned Magistrate Judge. Dkt. Nos. 4, 22, 23[1]; *see* 28 U.S.C. § 636(c). For the reasons explained below, the Commissioner's decision is REMANDED.

## *I. Background*

Plaintiff raises two issues. First, she contends that the Administrative Law Judge ("ALJ") erred by relying on his own lay opinion in assessing Plaintiff's

[1] The Court uses the page numbers auto-generated by Case Management/Electronic Case Files in its citations to docket entries.

limitations to create the residual functional capacity ("RFC") without medical opinions. Dkt. No. 11 at 8–16. Second, Plaintiff argues that the ALJ also erred in evaluating her subjective complaints about dizziness and imbalance. *Id.* at 16–19. The Court will address each point in turn after reviewing Plaintiff's medical history and the procedural background of this case.

### A. Plaintiff's Medical History

Plaintiff's lengthy medical records reflect her history of coronary artery disease (heart disease), hypertension (high blood pressure), cerebrovascular accident (stroke), and diabetes mellitus (diabetes). Since Plaintiff stopped working, her "heart and diabetes [have] gotten worse." Dkt. No. 7-3 at 49.

Plaintiff has diabetes mellitus type 2 with associated complications of cerebrovascular accident (CVA), proteinuria, and neuropathy. Dkt. No. 7-27 at 3, 8, 13, 18, 24, 28, 32, 37, 41, 45. In August 2021, Plaintiff's hemoglobin A1C ("HbA1c") (a measure of long-term blood sugar control) measured 13.8%. Dkt. No. 7-10 at 8. On September 30, 2021, Plaintiff went to the emergency room complaining she had acute chest pain with associated vertigo and increased left-sided weakness and paresthesia. Dkt. No. 7-11 at 37–39. She was hospitalized with uncontrolled diabetes, and a diagnosis of CVA with paresthesia of the left arm and weakness. Dkt. No 7-11 at 32. Her HbA1c measured 13.8%—assessed as "uncontrolled diabetes mellitus." *Id.* at 33. Upon examination, the imaging test returned as negative for Plaintiff's head and neck, "with no aneurysm or stenosis present." *Id.* at 43. Progress notes stated that Plaintiff's "continued abnormal gait and unsteadiness of her feet may be side effects

from her CVA 6 years ago because recent imaging does not suggest acute stroke." Dkt. No. 7-11 at 44. The neurologist's impression and plan of care included: a "right brain CVA," initiating therapy for increased left hemiparesis, monitoring closely left paresthesia, continued medical management of the small-vessel cardiovascular disease, and initiating physical and occupational therapy for the left dysmetria. *Id.* at 47–48. Plaintiff was discharged three days later with both her MRI and CT scans showing "unremarkable for acute findings such as stroke or hemorrhage." *Id.* at 51. By October 2021, providers noted residual left-sided weakness. Dkt. No. 7-17 at 173. In October 2021, Plaintiff followed up with her endocrinologist and reported a minor stroke from September 30. Dkt. No. 7-27 at 45. She was urged to better control her glucose levels, including by improving her diet, and warned about risks and complications associated with uncontrolled diabetes. *Id.* at 47.

Throughout 2022, Plaintiff continued receiving treatment for her diabetes, heart, and neurological conditions. In May 2022, her long-term blood sugar level increased to 14.5%. Dkt. No. 7-14 at 25. Plaintiff complained at an appointment in May about occasional dizzy spells she had experienced since her stroke which worsened with quick movements. Dkt. No. 7-15 at 26. Plaintiff also reported having sprained her ankle in a fall from a dizzy spell. *Id.* A neurological examination assessing her motor strength showed "bulk is normal, function is normal, motor is grossly normal, 5/5 power to right arm and bilateral legs, 4+/power to left arm, tone normal." *Id.* She "[was] able to weight bear and ha[d] no swelling or bruising with mild tenderness on rotation." *Id.* In September 2022, Plaintiff's neurologic

examination showed "normal upper and lower extremity motor strength and function." Dkt. No. 7-15 at 42. Another contemporaneous exam by her cardiologist on September 13, 2022, noted "[n]ormal [range of motion] and strength for age and lifestyle." Dkt. No. 7-19 at 7. She was assessed with carotid stenosis, bilateral, type 2 diabetes mellitus with other circulatory complications, loss of balance, cataract of both eyes, and mixed hyperlipidemia (high cholesterol). *Id*. at 43. She was referred for a carotid arteriogram. *Id*. Chest pains led Plaintiff to a short hospitalization on September 18, 2022. Dkt. No. 7-20 at 43. Her cardiologist found an 80% stenosis in the left anterior descending artery and placed a coronary artery stent. *Id.* At a follow-up appointment after the hospitalization, an echocardiogram reported normal. *Id*.

In October 2022, an examination recorded Plaintiff's "[g]ross motion function intact." Dkt. No. 7-19 at 9. At another appointment days later, Plaintiff reported falling and pain when moving her arm but did not go to the ER and was sleeping and eating well. Dkt. No. 7-20 at 36. In a December 2022 follow-up with her primary providers, Plaintiff was assessed with coronary artery disease with stable angina pectoris. Dkt. No. 7-20 at 33. She had no complaints and reported sleeping and eating well. *Id*. at 34. She denied muscle aches and showed no loss of neurologic strength. *Id*.

By February 2023, testing of the arteries in Plaintiff's neck showed no significant abnormalities Dkt. No. 7-19 at 22. Physical examinations during this period generally showed a normal walking pattern, normal posture, normal joint movement, and no swelling, despite Plaintiff's history of left-sided weakness

following her stroke. Dkt. Nos. 7-18 at 126, 7-18 at 28, 7-19 at 23. She was instructed to continue taking meclizine for her dizziness and to follow up with her primary care physician for her diabetes monitoring and improving her diet. Dkt. No. 7-18 at 127. In March 2023, imaging revealed that one of the arteries supplying blood to her heart was 70% to 80% blocked. Dkt. No 7-19 at 30. In May 2023, providers again noted reduced strength in Plaintiff's left arm and left leg. Dkt. No. 7-20 at 25. By August 2023, treatment notes indicated that Plaintiff's left arm weakness was improving, with motor strength showing normal bulk, function, and tone, and grossly normal motor function, with 5/5 power to right arm and bilateral legs, 4+/5 power to left arm. Dkt. No. 7-18 at 129. She also reported dizziness that was rated as "moderate" and was referred to physical therapy for gait and balance training. *Id*. at 129-31. During a neurological exam, she denied loss of strength and loss of use of extremity, while reporting no low back pain or memory loss, no pain, no paralysis or stroke. *Id*. at 130. On October 13, 2023, Plaintiff went to the emergency room complaining of intermittent abdominal pain. Dkt. No. 7-25 at 29. On arrival, she was observed to be in no acute distress and although a physical examination showed mild tenderness over her upper left abdomen, there were no other acute concerning findings. *Id*. After an extensive work up, including labs and imaging, Plaintiff was not admitted and was discharged with instructions to follow up with her primary care physician. *Id*. In November 2023, Plaintiff reported improvement with physical therapy but stopped therapy due to abdominal left side pain. Dkt. No. 7-18. She was referred to a gastroenterologist. *Id*. At another November appointment, Plaintiff reported feeling

fatigue and sleeping a lot. Dkt. No. 7-20 at 7. Decreased strength was noted on her left arm and lower leg. *Id.* at 8.

Despite treatment with endocrinologists, Plaintiff's glucose levels remained uncontrolled in 2023. In May 2023, her HbA1c measured at 14.5% and she reported experiencing lower extremity swelling. Dkt. No. 7-27 at 37, 39. At visits in September and November, her HbA1c measured at 13.6% and she was warned about "the need to control her glucose levels now in order to decrease complications associated with uncontrolled diabetes which include but not limited to new or worsening Neuropathy, Retinopathy, Nephropathy, Gastroparesis, etc., as well as her increased risk for [myocardial infarctions] and Strokes." *Id.* at 30, 35.

Medical records from 2024 likewise reflect a mixed picture. In January 2024, Plaintiff continued to exhibit reduced strength in her left arm and left leg, although she retained normal sensation. Dkt. No. 7-20 at 3. Follow-up heart testing in March 2024 showed no evidence of reduced blood flow to the heart, and physical examination demonstrated normal range of motion and motor function. Dkt. No. 7-24 at 3–4. Elevated glucose levels led to an emergency room visit on March 7, 2024, where she was diagnosed with acute UTI and hyperglycemia due to type 2 diabetes. Dkt. No. 7-25 at 60. Plaintiff's HbA1c measured higher than 15.5% during this time, prompting discussions with her endocrinologist about recommendations for evaluations to deal with her glucose fluctuations and associated symptoms of dizziness, fatigue, and urinary symptoms to rule out diabetic ketoacidosis (DKA). Dkt. No. 7-27 at 26. Dietary counseling continued as part of her treatment plan. Appointment notes from

an endocrinologist visit on April 10, 2024, noted that Plaintiff was hospitalized for "high (DKA) or low sugars" in 2024 and that her diabetes remained uncontrolled. *Id.* at 13, 15. Plaintiff was hospitalized again between April 11–14, 2024, complaining about abdominal pain, diarrhea, and vomiting for two days. Dkt. No. 7-25 at 75–109. Her assessments included nausea and vomiting, gastroenteritis, abnormal CT scan of the kidney, urinary tract infection, uncontrolled diabetes, noncompliance, dyslipidemia, and hypertension. *Id*. Contrary to Plaintiff's report to hospital staff that her glucose levels "had been controlled recently," her endocrinologists noted that her diabetes remained uncontrolled based on her average glucose levels with frequent lows. *Compare* Dkt. No. 7-25 at 97 with Dkt. No. 7-27 at 15. In July 2024, Plaintiff reported increased dizziness and feeling weak at times. Dkt. No. 7-25 at 135. Physical examination nevertheless continued to show generally normal muscle strength, except for mild weakness in her left arm, reduced sensation in her left leg, and diminished reflexes on her left side. Dkt. Nos. 7-25 at 135–36, 7-26 at 5. Progress notes from Plaintiff's endocrinologist in June and July 2024 record uncontrolled diabetes based on HbA1c of 13.8% and average glucose of 264. Dkt. No. 7-27 at 3–12. Plaintiff's nonadherence to medication was also noted in both June and July: "Also has history of non-adherences with statins. If she continues with non-adherence, she risks being discharged from clinic." Dkt. No. 7-27 at 7, 12. Her last visit in the record on July 29, 2024, noted that she experienced frequent hypoglycemic events in early morning despite Plaintiff's reports that she had been consistent with her insulin and diet. *Id*. at 5. She was warned about hypoglycemia and again about the need to control

her glucose levels to ward off end-organ complications associated with uncontrolled diabetes. *Id.*

Plaintiff provided more information about her impairments and their effects in a function report completed in January 2024 and through her testimony during the August 6, 2024, hearing before the ALJ. Plaintiff testified that she stopped working when she had her third stroke on August 10, 2021. Dkt. No. 7-3 at 47–48. She further asserted that her heart problems and diabetes worsened since she quit work. *Id.* at 49. In fact, her heart had "clogged up 80% and [her doctors] did a bypass on it." *Id.* She claimed her recent stress test on her heart was "completely worse than she had [before]." *Id.* at 50. She was given medication including aspirin to control her heart pain, which lasts "daily for couple of hours." Dkt. Nos. 7-3 at 50, 7-8 at 58. Furthermore, she stated that she "got diabetes when [she] was 30 years old and it's Type 2," resulting in her "getting very tiredness, sweating real bad" and her "swelling, headaches, feet [problems]." *Id.* She stated "sometimes [her sugar level] is out of control by itself" and her doctor has to prescribe her insulin, which had been changed "three or four times" to "make it work." *Id.* at 50–51.

Moreover, Plaintiff asserted that currently, she could not work because she suffers from a combination of various general symptoms allegedly resulting from her heart disease and diabetes. Dkt. No. 7-3 at 50–53, 24. Specifically, she stated that she has a mini-stroke on her left-side, resulting in her inability to open her lips fully, numbness over the left half of her body, and a swollen ankle. *Id.* at 52, 24. Meanwhile, she testified to her neck problems including "pain, tiredness, and stiff[ness]" and to

her "hands shaking sometime." *Id*. at 51. Plaintiff also testified to feeling dizzy daily, which limits her ability to move and forces her to lay on her bed. Dkt. Nos. 7-3 at 52–53, 7-8 at 59. She further stated that she lost balance while walking and standing. Dkt. Nos. 7-3 at 53, 7–8 at 59. She also testified that that she could only walk "less than half a block" or fifteen to twenty minutes without taking a break, could only stand for "less than an hour" before sitting down, and could only sit for "45 minutes" before "getting the pinch on [her] waist" and "[her] back feeling tiredness." *Id*. at 53. In Plaintiff's function report, she stated that she walked with the help of a cane. Dkt. No. 7-8 at 56. There, she also alleged several areas of functional limitations: lifting no more than ten pounds, walking "for few minutes", having a hard time climbing stairs, and needing help to get up from "bending and kneeling." Dkt. No. 7-8 at 55.

When it comes to personal life and daily activities, Plaintiff in her function report stated that in general, "[she] wake[s] up, eat[s] breakfast, and do[es] a little chores [sic], and take[s] care of [her] two disability children." Dkt. No. 7-8 at 51 (cleaned up). She reported to "prepare meal[s] daily with the help of [her spouse]" and "do food like sandwich[es], salad[s], and other simple stuff." *Id*. at 52. She then reported that she "do[es] chores with the help of [her] husband and go[es] outside only for watering plants." *Id*. (cleaned up). She regularly stays at home, except going shopping for groceries and "[taking] [her] kids to [the] bowling alley and mall." *Id*. at 54. She said she follows instructions well and socializes well. *Id*. at 55.

### B. ALJ Hearing and Findings

Plaintiff alleges that she became disabled on August 10, 2021, due to a number of ailments, including ongoing fatigue, dizziness and lower extremity weakness caused by hypertension, coronary artery disease, a history of strokes, and diabetes. Dkt. No. 11. She was born in 1978 and was 43 years old at the onset of her alleged disability. *Id.* 4. Plaintiff has at least a high school education and no past relevant work. *Id.*

On October 4, 2021, Plaintiff applied to Social Security for disability benefits and supplemental security income (collectively, "disability benefits"). Dkt. No. 11 at 4. After her application for disability benefits was denied initially on January 4, 2023, and upon reconsideration on March 21, 2024, Plaintiff requested a hearing before an administrative law judge (ALJ). *Id.*

On August 6, 2024, the ALJ conducted a telephonic hearing which Plaintiff and her representative attended. *Id.* At the hearing, Plaintiff's representative stated that Plaintiff had previously worked as a cook and cashier. Dkt. No. 7-3 at 42. She had stopped this work after suffering a third stroke. *Id.* at 46–47. He noted her medical impairments included "diabetes, high blood pressure, medication problems, vision problems, heart problems, anemia, hand problems, and movement limitations with her left side." *Id.* at 42 He stated she had "generalized balance problems with difficulty sitting, standing, and walking for prolonged periods of time." *Id.* at 42–43. He also stated that she suffered from "dizziness, migraine, bilateral hand numbness and stiffness that causes her to grip with difficulty," and that she felt her mental

ability had "deteriorated, including memory loss and inability to stay on task." *Id.* at 43.

When questioned about her diabetes, Plaintiff stated she had first been diagnosed with type 2 diabetes at 30 years old. *Id.* at 49. She claimed the "reason that I got that it was because of when my house actually burned down, I was inside with my kids, and from then on, I started getting very tiredness, sweating real bad." *Id.* at 49–50. She stated when her mother took her to the hospital following the fire, she learned that she had diabetes. *Id.* at 50. Plaintiff discussed her symptoms, indicating there was a lot of tiredness" and "swelling, headaches, my feet, everything." *Id.* When asked, "Are you having problems controlling your sugar levels," Plaintiff responded, "No, it's—sometimes it's out of control by itself and sometimes I have to control it which I do control it, but it's a—if I do my injection, it goes up instead of going down." *Id.* She also mentioned the latest scare she had involving her diabetes where she "had a sugar of 32 at midnight." *Id.* She also remarked that the doctors had changed her diabetes medication three or four times. *Id.* at 51.

Regarding her dizziness, Plaintiff reported experiencing dizziness "every single day." *Id.* at 52. To deal with her dizziness, Plaintiff explained she would just "not move," stay in bed, lay down or sit in her recliner. *Id.* She also discussed her balance problems, saying she loses her balance when walking, "just suddenly," even with the help of a cane, "completely every single day." *Id.* at 53 Plaintiff reported being able to walk less than half a block before needing to sit down. *Id.* at 53.

Following the hearing, the ALJ issued an unfavorable decision on August 29, 2024, finding Plaintiff not disabled. Dkt. No. 7-3 at 20–28. The ALJ applied the five-step sequential evaluation process as prescribed by the Social Security Administration in order to determine whether Plaintiff was disabled. Dkt. No. 7-3 at 21–27. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 10, 2021. Dkt. No. 7-3 at 22. At step two, the ALJ found Plaintiff had severe impairments of hypertension, coronary artery disease, cerebrovascular accident, and diabetes mellitus. *Id.* At step three, however, the ALJ found that no impairment or combination of impairments met or medically equaled a listed impairment. *Id.*

At step four, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), subject to additional physical limitations. Dkt. No. 7-3 at 24. The ALJ found that Plaintiff's impairments, ongoing fatigue, and reported problems with her hands to be limiting and incorporated these limitations into the RFC assessment. *Id.* at 26.

The ALJ determined that Plaintiff was not disabled because she retained the RFC to perform light work with certain postural and environmental restrictions, and that jobs existed in the national economy which Plaintiff could perform. *Id.* at 24–27. Relying on the testimony of a vocational expert, the ALJ determined that Plaintiff could perform representative occupations existing in significant numbers in the national economy, including housekeeper, cashier II (general retail-store cashier), and material distributor. *Id.* at 27–28. Plaintiff requested appellate review of this

decision. Dkt. No. 7-3 at 7. On April 23, 2025, the Appeals Council denied her request for review. *Id*. Thus, the August 29, 2024, decision of the ALJ became the final decision of the Commissioner. Plaintiff filed suit in this court appealing the determinations of the Commissioner.

## *II. Legal Standards*

### A. Standard of Review

Section 405(g) governs judicial review of the Commissioner's final decision and provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court has explained that, under this standard, the reviewing court examines the existing administrative record for sufficient evidence to support the agency's factual determinations. *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). The evidentiary threshold "is not high"; substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The Fifth Circuit applies an "exceedingly deferential" standard when reviewing Social Security disability claims. *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). Judicial review asks only whether the Commissioner's final decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards to evaluate the evidence. *Madkins v. Bisignano*, 150 F.4th 657, 662 (5th Cir. 2025) (per curiam). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Whitehead*

*v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). A reviewing court therefore "does not reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B. Development of the Record**

The ALJ has "a duty to fully and fairly develop the facts." *Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015). That duty extends to developing "all relevant facts," rather than "collecting all existing records." *Id.* at 509. Accordingly, the inquiry is whether the ALJ obtained the information necessary to make the disability determination. *See id.* Where the record contained "ample objective and opinion evidence supporting the ALJ's conclusions," the Fifth Circuit held that the ALJ was not required to obtain additional records from a treating physician. *Jones v. Astrue*, 691 F.3d 730, 733–34 (5th Cir. 2012).

Social Security regulations separately provide that the agency "may purchase a consultative examination" when the evidence is inconsistent or "insufficient to allow [the agency] to make a determination or decision" on a claim. 20 C.F.R. § 404.1519a(b). However, a "consultative examination is required to develop a 'full and fair record' only if 'the record establishes that such an examination is necessary to enable the [ALJ] to make the disability decision.'" *Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021) (quoting *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016)). Thus, where the record was "replete with medical documents that spanned years" and "[n]othing

in the record suggest[ed] that the ALJ needed any more medical information to reach an informed decision," the Fifth Circuit found no error in declining to order a consultative examination. *Id.*

Under Fifth Circuit precedent, reversal for inadequate development of the record requires the claimant to show "(1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). "To establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.'" *Id.* (quoting *Kane*, 731 F.2d at 1220). "The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error. A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden." *Jones*, 691 F.3d at 734–35.

## *III. Background*

Plaintiff argues that the ALJ erred by formulating an RFC without a medical opinion. Dkt. No. 11 at 8. Although Plaintiff's record included the opinions of two state agency medical consultants, the ALJ found these opinions only partially persuasive. Dkt. No. 7-3 at 26–27. Thus, Plaintiff argues, the ALJ did not rely on substantial evidence when crafting his RFC assessment. Dkt. No. 11 at 10. Plaintiff further argues that the "ALJ failed to properly consider the Plaintiff's subjective complaints when making an ultimate determination regarding his RFC." *Id.* at 17.

Both points of error, Plaintiff asserts, are grounds for reversing and remanding the ALJ's decision for further proceedings.

### A. Disability Determinations

Under Title II of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment… which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner evaluates disability through a five-step sequential inquiry addressing whether the claimant: (1) engages in substantial gainful activity; (2) has a severe impairment; (3) has an impairment meeting or medically equaling a listed impairment; (4) can perform past relevant work; and (5) can perform other work. *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002); 20 C.F.R. § 404.1520(a)(4). A determination of disability or nondisability at any step ends the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden through the first four steps; at step five, the burden shifts to the Commissioner to establish that the claimant can perform other work existing in the national economy and is therefore not disabled. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam).

The RFC assessment is "based on all of the relevant medical and other evidence," and the regulations require consideration of "any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations." 20 C.F.R. § 404.1545(a)(3). In making a claimant's RFC assessment, "an ALJ examines the medical evidence in the

record, including the testimony of physicians and the claimant's medical records." *Webster*, 19 F.4th at 718.

### B. The ALJ Was Not Required to Obtain Another Medical Opinion

The ALJ found the opinions of the state agency consultants "not fully persuasive." Dkt. No. 7-3 at 26–27. Plaintiff claims the ALJ thus erred when he "determined the RFC without considering any medical opinions about the Plaintiff's physical restrictions, instead relying on his own interpretation of the records." Dkt. No. 11 at 9. However, there is no per se requirement that an ALJ rely on medical opinion evidence when making an RFC determination, and the ALJ did not err by not doing so.

One precedential Fifth Circuit decision frames the discussion on whether as a matter of law an ALJ must rely on medical opinions[2] to craft an RFC: *Ripley v. Chater*, 67 F.3d 552, 557–58 (5th Cir. 1995), which considered an RFC determination made without a medical source statement. Although *Ripley* did not make the absence of a medical opinion dispositive, it ultimately found a lack of substantial evidence due to the absence of one. In *Ripley*, the Fifth Circuit considered whether the ALJ had fully developed the record in concluding that the plaintiff "was capable of performing sedentary work, even though there was no medical testimony supporting this conclusion." 67 F.3d at 557. The Fifth Circuit stated that in situations "where no medical statement has been provided, [the Court's] inquiry focuses upon whether the

---

[2] As defined in the Code of Federal Regulations, a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions." 20 C.F.R. § 404.1513(a)(2).

decision of the ALJ is supported by substantial evidence in the existing record." *Id.* at 557. Finding a lack of substantial evidence to support the RFC determination, the Fifth Circuit remanded the case for additional proceedings and ordered that a report from a treating physician be obtained. *Id.*

Medical opinions are just one of several categories of evidence the ALJ considers in making RFC determinations. Even when the record lacks an opinion "describing the types of work that the applicant is still capable of performing," "[t]he absence of such a statement… does not, in itself, make the record incomplete." *Wills v. Kijakazi*, No. 22-20609, 2023 WL 4015174, at *3 (5th Cir. June 14, 2023) (quoting *Ripley*, 67 F.3d at 557).

Accordingly, an ALJ is not necessarily required to order a consultative examination when there is no medical opinion she finds persuasive. The relevant question is whether there is substantial evidence in the record to support an informed decision. *See Webster*, 19 F.4th at 720 ("Nothing in the record suggests that the ALJ needed any more medical information to reach an informed decision about whether Webster was disabled. The ALJ's decision was based upon substantial evidence in a sufficiently developed record, and he did not err in declining to order the [consultative examination]."); *Vasquez*, 2024 WL 4381269, at *2 ("On this record, we agree with the district court that the ALJ was not obliged to seek a medical opinion to assess Vasquez's RFC or to develop the record any further."); *Carol B. v. Kijakazi*, No. 4:23-CV-03484, 2025 WL 492500, at *5 (S.D. Tex. Jan. 24, 2025) ("*Ripley* does not stand for the proposition that an ALJ must always obtain a medical opinion, or that an ALJ

cannot formulate an RFC without one."). "Rather, the ALJ must assess a claimant's RFC based on all relevant record evidence." *Id.*

### C. There Was a Lack of Substantial Evidence to Support the ALJ's RFC Determination

Plaintiff claims the ALJ's opinion was unsupported by substantial evidence for several reasons, including the argument discussed above that there was no fully persuasive medical opinion in the record. Dkt. No. 11 at 9–15. While we do not find many of Plaintiff's arguments particularly availing, two points of error warrant discussion. First, there was a lack of substantial evidence to find the Plaintiff's diabetes was controlled. *See* Dkt. No. 7-3 at 27. Second, regarding Plaintiff's claims of daily dizziness and problems with balance, the ALJ lacked substantial evidence in finding these reports of her symptoms were inconsistent with the record. *Id.* at 25–27.

#### 1. Uncontrolled Diabetes

Plaintiff, at the hearing before the ALJ, was asked whether she was "having problems controlling her sugar levels." Dkt. No. 7-3 at 50. She responded, "No, it's—sometimes it's out of control by itself and sometimes I have to control it which I do control it." *Id.* The Plaintiff also told a doctor—during a visit for reported abdominal pain—that her diabetes "had been controlled recently." Dkt. No. 7-25 at 97. This the ALJ took as significant, stating several times that her diabetes was under control. Dkt. No. 7-3 at 24 ("She does not have problems controlling her sugar."), 26 ("She stated her diabetes mellitus had been controlled recently." "Further, in April 2024,

the claimant reported that her diabetes had recently been controlled."), 27 ("Further, in April 2024, the claimant reported that her diabetes had recently been controlled."). In discussing why he felt greater limitations were not warranted in her RFC, the ALJ specifically cited this self-report of controlled diabetes as one of the reasons.

Yet, Plaintiff's diabetes was not controlled. As Plaintiff herself noted in the hearing, her diabetes had gotten worse over the past few years. *Id.* at 50. The record shows Plaintiff was assessed as having uncontrolled diabetes as early as August 2021. Dkt. No. 7-10 at 8. In October 2021, she was told she needed to better control her glucose levels and was warned about the risks and complications associated with uncontrolled diabetes. Dkt. 7-27 at 47. By May 2022, her long-term blood sugar level had risen even higher. Throughout 2023, despite working with endocrinologists, Plaintiff's glucose levels remained uncontrolled. Dkt. No. 7-27 at 30, 35, 37, 39. At visits in September and November 2023, she was warned about the need to control her glucose levels in order to decrease complications with uncontrolled diabetes, such as neuropathy, retinopathy, nephropathy, and gastroparesis, and strokes. *Id.* at 30, 35. On March 7, 2024, she was diagnosed with acute UTI and hyperglycemia due to her uncontrolled diabetes, her blood sugar level having risen even higher still. Dkt. No. 7-25 at 60. Progress notes from her endocrinologist in June and July 2024 also recorded uncontrolled diabetes. Dkt. No. 7-27 at 3–12. And at her last visit in the record, on July 29, 2024, Plaintiff was warned about hypoglycemia and the need to control glucose levels to ward off end-organ complications associated with uncontrolled diabetes. *Id.* at 5.

It is clear from a close examination of the record that there is not substantial evidence to support the ALJ's characterization of Plaintiff's diabetes as "controlled." *See Stevenson v. Colvin,* No. CIV.A. G-12-259, 2015 WL 6396035, at *3 (S.D. Tex. Oct. 22, 2015) (finding error where "the ALJ based her determination on erroneous assumptions (i.e., that her [diabetes] were controlled with medications), which is not supported by substantial evidence in the record"). His reliance on this misunderstanding when deciding that greater limitations in Plaintiffs RFC were not warranted is error.

**2. Dizziness & Balance**

In evaluating Plaintiff's symptoms, the ALJ follows a two-step process. SSR 16-3p, 82 Fed. Reg. 49,462 (Oct. 25, 2017). First, he considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." *Id.* Upon finding such impairments, the ALJ "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Dkt. No. 7-3 at 24; *see* SSR 16-3p; 20 C.F.R. § 404.1529.

The ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." Dkt. No. 7-3 at 24. This included Plaintiff's assertions that she gets "dizzy and has no balance." He next found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." But the ALJ

does not elaborate at any other point in his decision on why or how he considered Plaintiff's reports of dizziness and imbalance and the extensive evidence in the record which supports her complaints.

"Although an ALJ is bound to explain his reasons for rejecting a claimant's complaints…, he is not required to follow formalistic rules in his articulation." *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 905 (5th Cir. 2010) (quoting *Falco v. Shalala*, 27 F.3d 160 (5th Cir. 1994)) (cleaned up). Still, an ALJ "must build an accurate and logical bridge between the evidence and the final determination." *Price v. Astrue*, 401 F. App'x 985 (5th Cir. 2010). "If the logical connection between a medical opinion and an RFC limitation can be clearly inferred, the ALJ's failure to directly articulate it is not an error warranting remand." *Tricia v. Bisignano*, No. 4:25-CV-00683-BU, 2026 WL 395706, at *7 (N.D. Tex. Feb. 12, 2026).

Here—regarding Plaintiff's history of dizziness and problems with balance—we find no logic bridge between the evidence and the ALJ's RFC determination. Plaintiff, both in her function report and her testimony at the hearing, explained that she frequently experiences dizziness. Dkt. No. 7-8 at 28, 29 (mentioning she gets dizzy when she stands up from the toilet), 30 (explaining she sits down to do laundry because she gets dizzy); Dkt. No. 7-3 at 52 ("Dizziness is actually every single day"). Throughout the record, there is evidence that Plaintiff complained of dizziness to her medical carers. Dkt. Nos. 7-15 at 26, 7-18 at 127, 129–31, 7-25 at 135, 7-27 at 8. It is difficult to see how a careful reading of the record could have led the ALJ to determine

that Plaintiff's complaints of dizziness were inconsistent with such substantial evidence.

Plaintiff's reports of imbalance were likewise given short shrift. At the hearing, Plaintiff explained that she does "get unbalance completely every single day." Dkt. No. 7-3 at 53. She also expressed that she uses a cane to walk, that she has to hold onto something while walking, and that she sometimes uses the "electric chairs." *Id.* This comports with what she stated in her function report, where she lists "unbalance" as a condition: that she doesn't go outside alone because she loses her balance and gets dizzy, that when walking she has to hold onto a cart or a person, that she has problems with her balance when bathing, and that she has trouble kneeling because she gets out of balance. Dkt. No. 7-8 at 28–33. Her medical records, too, reveal a history of problems with her balance. Dkt. Nos. 7-15 at 23, 43, 58, 7-17 at 104, 172, 180, 7-19 at 38.

Aside from a brief mention when discussing Plaintiff's testimony, the ALJ did not place any emphasis at all on Plaintiff's problems with balance. Dkt. No. 7-3 at 24. Instead, he emphasizes her "normal range of motion, and normal upper and lower extremity strength." *Id.* at 25. However, normal motor function is not necessarily indicative of the ability to balance or walk unassisted. The Social Security Listing of Impairments—used at step three of Social Security disability determinations—offers some insight into this distinction. In the Listing of Impairments, when evaluating for peripheral neuropathy, the ALJ first must find a disorganization of motor function in two extremities. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.14 (2026). It is only when he

finds a disorganization of motor function that he moves onto the question of whether this disorganization results in an "extreme limitation in the ability to… balance while standing or walking." *Id.* Thus, even though Plaintiff may have had "grossly normal motor functioning with 5/5 power to her right arm and bilateral legs and 4+/5 power to her left arm," this was separate from any issues she may have with imbalance. Dkt. No. 7-3 at 27.

"It is well established that the 'Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision.'" *Vansa v. Astrue*, 423 F. App'x 381, 383 (5th Cir. 2011) (quoting *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995)). Although "[i]t is not the place of this Court to reweigh the evidence, or try the issues de novo, or substitute its judgment for the Secretary," the ALJ's findings must nonetheless be "supported by substantial evidence." *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). Here, we do not find that substantial evidence supports the ALJ's findings regarding Plaintiff's diabetes, dizziness, and imbalance. Because "a logical connection" between the evidence and the RFC cannot "be clearly inferred," this is an error warranting remand. *Tricia*, 2026 WL 395706, at *7.

### D. Plaintiff Was Prejudiced by the ALJ's Error in Crafting the RFC

Even if the ALJ erred, reversal requires a showing of prejudice. *Ripley*, 67 F.3d at 557. "Procedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). "To establish prejudice,

a claimant must show that he 'could and would have adduced evidence that might have altered the result.'" *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).

In this case, Plaintiff was prejudiced by the ALJ's errors. If the ALJ had properly considered Plaintiff's uncontrolled diabetes and complaints of dizziness and imbalance, it is likely that the RFC would have been different. Additionally, because the testimony of the vocational expert relied on a hypothetical that was identical to the RFC determination in the ALJ's decision, if the RFC was not based on substantial evidence, then the vocational expert's testimony similarly falls short. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *see also Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("The testimony of the vocational expert in this case cannot constitute substantial evidence to support the ALJ's findings. A vocational expert's testimony in a disability benefits proceeding is valuable only to the extent that it is supported by medical evidence.") (citation omitted). Accordingly, Plaintiff was prejudiced by the ALJ's errors, and remand is warranted.

## ***IV. Conclusion***

For the foregoing reasons, Plaintiff's Complaint, Dkt. No. 3, is **GRANTED**. The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

IT IS SO ORDERED.

Signed this September 30, 2026, in Laredo, Texas.

Diana Song Quiroga
United States Magistrate Judge